UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MONTE WHITE,<br>Plaintiff, | : | |
| v. | : | 3:21cv189 (OAW) |
| DARRANT, et al.,<br>Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**THIS ACTION** is before the court upon Defendants' Motion for Summary Judgment and memorandum in support thereof (together "Motion"). ECF 84 and 84-1. The court has reviewed the Motion, Defendants' Statement of Facts, ECF No. 84-2, Plaintiff's opposition brief, ECF No. 92, Plaintiff's Statement of Facts, ECF No. 92-1, Defendants' Reply in support of the Motion, ECF No. 98, Plaintiff's Sur-Reply, ECF No. 103, Defendants' response to Plaintiff's Statement of Facts, *see* ECF No. 104, all supporting exhibits, and the record in this matter, and is thoroughly advised in the premises. After careful review, the Motion is **GRANTED in part and DENIED in part.**

## I. BACKGROUND[1]

With a few exceptions noted herein, the relevant facts are not in dispute. At all times relevant to this action, Mr. White was a sentenced inmate in the custody of the Connecticut Department of Correction ("DOC"). He initially was housed in the general

[1] Unless otherwise noted, all facts are taken from Plaintiff's responses to Defendants' Statement of Facts and his additional facts thereto, which encompasses both parties' positions on most of the operative facts. ECF No. 92-1.

population at Cheshire Correctional Institution ("Cheshire"), but concerns arose that he might be at risk of harm from other inmates, and so he was placed in protective custody ("PC") status. This meant he was housed within the PC Unit, away from the general population.

While in the PC Unit, though, on April 17, 2020, Plaintiff was assaulted by another inmate housed there.[2] Plaintiff's jaw was broken and he required surgical treatment at an outside hospital. After his discharge from the hospital, Plaintiff was moved to the infirmary at Garner Correctional Institute ("Garner") to convalesce.

Plaintiff still was in PC status throughout his recovery, which made him fear he would have to return to the Cheshire PC Unit, where he had been attacked, which fears he expressed to prison staff. ECF No. 104 ¶ 4 and response. He nevertheless was transferred back to Cheshire on May 6, 2020, and temporarily was placed in a quarantine unit per COVID protocols. While there, he sought to have his PC designation removed, stating that he would prefer to return to general population. He also asked to be moved to an entirely different facility.

It appears that a separation profile already had been created which would have prevented Plaintiff and his attacker from being housed such that they could meet again, though it is disputed whether Plaintiff was informed of that separation profile. *Id.* ¶ 5 and response.

Ultimately, Plaintiff's request for removal back to general population or for a transfer to a new facility was denied. On May 28, 2020, he was informed he would be

---

[2] Defendants initially referred to this as an "altercation," but later admitted it was an assault. ECF No. 104 ¶ 1 and response.

returned to the PC Unit. Believing he would soon be face-to-face with his attacker again, he refused the housing assignment, and consequently was issued a disciplinary ticket and was sent to the restrictive housing unit.

While in restrictive housing, Plaintiff asserts he was offered a deal (allegedly on behalf of the Unit Manager) that if he did not challenge the disciplinary ticket for refusing housing, he would be transferred to a different prison's PC Unit. He agreed, and shortly thereafter he was transferred to MacDougall Walker Correctional Facility ("MacDougall").

Even at MacDougall, though, Plaintiff contends that his anxiety continued, and he feared that he could be forced to return to the place he was assaulted. ECF No. 104 ¶ 53 and response.[3] Ultimately, he was diagnosed with and treated for Post-Traumatic Stress Disorder ("PTSD"). *Id.* ¶ 52 and response.

Plaintiff initiated this action on February 16, 2021. The Honorable United States District Judge Kari A. Dooley allowed two claims to proceed past initial review. Thereafter, no motion to dismiss was filed, and no summary judgment motion, save a "two-page motion without a memorandum of law" which was denied via text order at ECF No. 25. The matter was transferred to the undersigned, and it was scheduled for trial with the appointment of counsel to represent the plaintiff.

Plaintiff's pro bono counsel moved to reopen discovery, noting that very little had been done prior to their involvement. Given the circumstances, the court granted that request and also set a new deadline for dispositive motions. This time, Defendants filed the instant Motion.

---

[3] Where Defendants' response is nonresponsive, as here, the court deems the alleged fact admitted.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracnuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id*. This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see also Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."). Thus, "'[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party,' summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002)).

But a party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). Where there is no evidence upon which

a jury properly could return a verdict for the party producing it, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010) ("[The] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. <u>DISCUSSION</u>

After initial review, there are at least two claims remaining; the parties disagree as to whether a third has been recognized, and so the court will address that preliminary issue first.

In the initial review order, the Hon. United States District Judge Kari A. Dooley gave fulsome discussion only to any federal claims discernible in the complaint, as is appropriate and usual, since a case is unlikely to remain in federal court if its only cognizable claims arise from state law. Her Honor footnoted that Plaintiff's "complaint also raises claims of negligence," but that they would be resolved in the normal course, that is, through a motion to dismiss or a motion for summary judgment. ECF No. 10 at 1 n.2. There was no clear indication of which tort claims were asserted in the complaint. The undersigned later issued a ruling on September 6, 2022, clarifying that three claims survived initial review: an Eighth Amendment claim for deliberate indifference to Plaintiff's health and safety, and state law claims of intentional and negligent infliction of emotional distress. ECF No. 58 at 2. Defendants contend that no claim for intentional infliction of

emotional distress exists because it was not mentioned in the initial review order, and because the complaint does not assert one.

The court disagrees. The footnote which referred to "claims" of negligence (plural) did not specifically identify any state law claims discernible in the complaint. Furthermore, Defendants neither objected to the mention of an intentional tort in the undersigned's clarifying ruling, nor did they seek further clarification or dismissal in the eight months between that ruling and the filing of the instant motion. Finally and most importantly, the court is obligated to construe a self-represented litigant's complaint to raise the strongest claims it suggests, *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("It is well established that the submissions of a pro se litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'") (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir.2006)), and the court finds an intentional tort legitimately is discernible in Plaintiff's complaint. Accordingly, the court finds that there are three surviving claims to be discussed.

**A. Exhaustion**

Before turning to the substantive claims, the court first must address Defendants' procedural argument: that Plaintiff failed to exhaust his administrative remedies.

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust administrative remedies prior to filing a federal lawsuit regarding prison conditions.[4] 42 US.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding that "the

[4] Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.”). A claim is not exhausted until the inmate complies with all administrative deadlines and procedures, as laid out in relevant prison directives. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Failure to exhaust is an affirmative defense, *see Jones v. Bock*, 549 U.S. 199, 216 (2007), and “defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment,” *Johnson v. Mata*, 460 Fed. App'x 11, 15 (2d Cir. 2012).

Plaintiff first argues that Defendants have waived this affirmative defense by failing to raise it earlier in this litigation. Defendants respond that they preserved it in their answer to the complaint, and never affirmatively waived it thereafter, such that they may rely upon it now. It is undisputed that the exhaustion defense is waivable. *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004) (“We today . . . hold that this defense [of exhaustion under the PLRA] is waiveable.”). The question is whether Defendants’ actions effectively waived it although they properly pled it in their answer.

The court is persuaded by Plaintiff’s argument. Though in this circuit it generally is sufficient to plead an affirmative defense in an answer (without any requirement that an argument be brought in a dispositive motion), *see Villante v. VanDyke*, 93 F. App'x 307, 309 (2d Cir. 2004) (“We have, however, never required defendants who have properly pled the defense in their answer to also file a motion for summary judgment on exhaustion grounds in order to preserve the defense.”), the Second Circuit has found this specific affirmative defense to have been abandoned in certain circumstances. Though those

circumstances are not clearly defined in relevant jurisprudence, there are enough indicia of delinquency from these defendants that the court is comfortable concluding such an outcome is warranted here.

In *Testman*, for example, the Second Circuit concluded that the defendant correctional officers had waived their exhaustion defense because defense counsel had affirmatively stated to the district court that they were "not arguing exhaustion . . . for the following reason, we do believe that the exhaustion requirement does apply . . . we have not asserted it in our papers because we believe that there may well be a question of fact as to whether the plaintiff exhausted his administrative remedies with regard to that claim." *Testman*, 380 F.3d at 695. The same thing has happened here: defense counsel affirmatively stated to the court at a status conference that there had been no motion for summary judgment filed because there were too many issues of fact. While exhaustion was not explicitly noted in that discussion, that omission is immaterial. The Connecticut Office of the Attorney General is a sophisticated repeat player in defending against civil rights claims, and they appropriately may be deemed to have a thorough understanding of the procedural defense of exhaustion (as evidenced by its inclusion in the answer to the complaint) such that the assertion of questions of fact impliedly acknowledges no intent to pursue an exhaustion defense. This is sufficient grounds for the court to find that the government did waive the defense and may not raise it now.

This is particularly true where so much time passed before the defense was asserted. Judge Dooley's initial review order issued on April 9, 2021, *see* ECF No. 10, and Defendants appeared (through counsel) less than two months later, on June 1, *see*

ECF No. 14. On June 8, 2021, Defendants' answer identified exhaustion as its fifth affirmative defense. ECF No. 15. The court heard nothing more of this defense for *two years*. Defendants allowed the deadline for summary judgment motions to pass and made the representation that the omission was deliberate, citing questions of fact. Defense counsel confirmed that the defendants would be ready for trial in June 2022. *See* ECF No. 29. In reliance upon that representation, the court appointed counsel to Plaintiff (who appeared in March 2022). Despite appointed counsel's diligence, they could not be prepared for trial in June 2022, and so, again upon defense counsel's affirmative representation of trial readiness, the court rescheduled trial for October 2022. ECF Nos. 49, 50. Only after continuing trial twice again (to December 2022, *see* ECF No. 55, and then to April 2023, *see* ECF No. 63) did the court, sua sponte, determine that the sheer volume of supplemental discovery that had been undertaken merited setting a new dispositive motions deadline (over a year after the original deadline). ECF No. 63.

After that, Defendants conducted an independent medical examination of Plaintiff, *see* ECF Nos. 67 and 71, and the parties requested a referral to a United States Magistrate Judge for settlement, *see* ECF No. 72, which the court granted and which took place over the course of more than three hours, *see* ECF No. 80. At no point during these proceedings did Defendants raise exhaustion, or file a motion for judgment on the pleadings, or ask to file successive motions for summary judgment so as to address the low-hanging procedural fruit.

Against this tapestry of facts, it appears reasonable to deem the defense waived.[5] While Defendants decry the dissimilarities between the case at bar and *Handberry v. Thompson*, 436 F.3d 52 (2d Cir.), opinion amended on reh'g, 446 F.3d 335 (2d Cir. 2006), the court disagrees, and finds *Handberry* to be instructive. There, government actors defending against a class action brought by New York City inmates "waived or conceded" exhaustion arguments they attempted to make in a motion for summary judgment because two years prior they had represented that discovery was necessary to establish whether there was any grievance process available to the inmates. In their summary judgment motion, though, they only relied upon documents which were always available to the defendants, even before discovery. *Id.* at 59–60. Here, as there, Defendants always have had access to Plaintiff's grievances, even before two rounds of discovery, and thus always knew if exhaustion was a viable defense. Here, the court concludes that, as in *Handberry*, Plaintiff is "entitled to rely" upon defense counsel's earlier representation that summary judgment motions were not appropriate in this case, effectively "waiving or conceding" the issue of exhaustion. *Id.* at 60.

Even if the court were to conclude otherwise with respect to waiver, though, the court also finds that Plaintiff has satisfied the exhaustion requirement insofar as there is no further procedure available to him for this particular grievance.

---

[5] The law long has recognized that "equity aids the vigilant, not those who sleep on their rights," even enshrining the principal in the affirmative defense of laches. *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (quoting *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997)). While it is not clear that this doctrine is applicable here, and so the court does not rely upon it, the underlying maxim is worth noting in circumstances such as those presented here.

While the exhaustion requirement must be strictly enforced, it is well-settled that a prisoner need only exhaust *available* administrative remedies. *Ross v. Blake*, 578 U.S. 632, 642 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth*, 532 U.S. at 738). Thus, even where an administrative remedy is "officially on the books," it still may be unavailable such that failure to use it is not fatal to an inmate's suit. *Id.* at 642. The Supreme Court of the United States has recognized three circumstances in which an administrative remedy is unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

Defendants contend that Plaintiff failed to grieve any of the conduct giving rise to the claims at issue in this action, and the only relevant grievances he did file were not timely exhausted. Plaintiff counters, though, that there is *no* relevant grievance process for the decisions at issue.

It is undisputed that DOC's grievance processes are laid out in Administrative Directive 9.6. Defendants argue that subparagraph 9.6(6) thereof governed Plaintiff's grievance, which lays out a multistep process for administrative adjudication of the same.[6] But Plaintiff points out that Administrative Directive 9.6(8) very clearly includes decisions regarding PC as a "special management decision," subject to the separate appeal process of filing a Form CN 9602 within 15 days of the decision, and which explicitly is not appealable further. Separately, Administrative Directive 9.9, which governs PC, lists a specific process by which an inmate may request to be voluntarily removed from PC (by the filing of Form CN 9905, though it is silent as to any possible appellate process), and still another by which an inmate may challenge their involuntary placement in PC (including certain process before a decision, but without any appeal process thereafter).

The record shows that on May 12, 2020, Plaintiff submitted a Form CN 9601 seeking information about pressing charges against his attacker. ECF No. 84-12 at 21. On May 17, 2020, Plaintiff submitted a Form CN 9602 complaining that no one asked if he wanted to press charges and that officials did nothing after his assault but "let it be," noting he feared for his life at Cheshire and asking to be transferred to a different facility. *Id.* at 17. The grievance was denied on July 21, 2020, noting that Plaintiff was given an opportunity to press charges, but addressing Plaintiff's professed insecurity at Cheshire.[7] This appears to satisfy the grievance process for a "special management decision" in the

---

[6] First, an inmate must attempt informal resolution and document it via form CN 9601. If that proves unsuccessful, a formal grievance must be submitted via form CN 9602 (with form CN 9601 attached). If an inmate still is unsatisfied with the disposition, he may appeal that Level 1 disposition to Level 2, and thereafter he may appeal a Level 2 disposition to Level 3.

[7] Plaintiff's transfer request would have been moot at this point anyway, as he had transferred to MacDougall by this time.

first instance, and there does not appear to have been any hearing or investigation as required by A.D. 9.9 (for involuntary placement in PC), so it seems that DOC did not believe that provision applied to Plaintiff's situation. And while he was housed in the quarantine unit at Cheshire, he did complete Form CN 9905 (at the direction of and with the help of corrections staff), which was returned with an unfavorable decision for which, per A.D. 9.9, there was no clear means to appeal.

This factual history leads the court to conclude that (1) the grievance process Plaintiff ought to have followed to prevent his re-designation to the PC Unit is so unclear that it is "unavailable," but also (2) Plaintiff satisfied the requirements of every plausibly applicable grievance process, and (3) DOC guidance that Plaintiff submit the 9905 thwarted Plaintiff's ability to correctly follow the grievance procedure, if that indeed was not the correct process. Accordingly, the court finds that even if the exhaustion defense were not waived, it is satisfied either by Plaintiff's actual administrative journey, or by the unavailability of a single, coherent grievance process.

**B. <u>Deliberate Indifference</u>**

Turning to Plaintiff's substantive (and first, explicitly stated) claims, the unusual procedural history of this action has left little exposition of the claims prior to this (second) summary judgment phase. In fact, the only framing of the claim outside the complaint itself came very early in litigation in the initial review order. Judge Dooley stated therein that the court construed the complaint to allege Defendants "violated the Eighth Amendment by acting with deliberate indifference to his health and safety." ECF No. 10 at 3–4. More specifically, the court permitted Plaintiff to proceed on a claim that

Defendants "acted with deliberate indifference to the substantial risk of harm to [Plaintiff] by confining him in the same unit or facility as" his attacker. *Id.* at 6. Importantly, Her Honor recognized that it was "unclear whether such placement ever occurred," *id.* at 5, but nevertheless found that Plaintiff had "sufficiently alleged that he was subjected to a substantial risk of harm by being confined in the same unit or facility as" his attacker. *Id.* The court explicitly noted, though, that Plaintiff had "not alleged that any defendant has acted with deliberate indifference to his serious medical need." *Id.* at 4 n.4.

Defendants' arguments for summary judgment clearly conceive of the "harm" identified by Judge Dooley to be only another assault upon Plaintiff by the same assailant. Plaintiff, however, identifies several harms that fit within the broad description of "a substantial risk of harm." He purports to predicate his Eighth Amendment claim not only upon the (admittedly unrealized) risk of another assault by the original assailant, but also upon the risk of another assault by the assailant's associates, and the psychological harm resulting from Plaintiff's belief that he soon would be vulnerable to further bodily harm. Further, with respect to the psychological harm, Plaintiff asserts two points of indifference: Defendants' refusal to house him anywhere but the Cheshire PC Unit, and their failure to inform him of the steps they were taking to keep him safe.

As the court noted already, Plaintiff's self-represented complaint must be construed to state the strongest claims it suggests. The court now finds the claim, as Plaintiff presently describes it, is the strongest suggested by his complaint. Accordingly, the court accepts Plaintiff's position.

Having addressed the specific theories for analysis, the court turns to the merits.

"[A] prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (alterations in original). "To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir.2001)) (alteration in original). To show Defendants acted with deliberate indifference, Plaintiff must show that they acted with more than mere negligence. *Farmer*, 511 U.S. at 835. "The prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012).

**a. *Personal Involvement***

Defendants first argue that Plaintiff has failed to show Defendants' personal involvement in any alleged violation. Specifically, Defendants contend they did not have the authority to move Plaintiff to a different institution or back to the general population. Plaintiff calls this assertion into doubt, pointing to his claim that his ultimate removal to a different facility was effected by the individuals who say they could not do so. And he contends that Defendants Faraci and Owen failed to inform him that he would not be

housed with his assailant when they told him his request for a transfer had been denied.

As to Defendants Faraci and Owen, the court finds that their alleged failure to inform Plaintiff of the separation profile is enough to show their personal involvement. But any allegations against Defendant Butricks personally are too speculative to support any claim against him. Plaintiff contends that there are questions of fact as to what he was capable of doing to protect Plaintiff, but there is nothing specific that he allegedly did or did not do. In fact, it is undisputed that he supported Plaintiff's request to be removed from PC status. Plaintiff asserts he ought to have initiated other separation profiles, but he does not name anyone specifically whom anyone ought to have known was a threat to him (he merely refers to unidentified "associates" of his assailant). And as to the alleged deal through which he ultimately was transferred to MacDougall, Plaintiff consistently alleges that it was offered by the "Unit Manager," though it is unclear who that person actually was. Absent any clear identification of that individual, the court cannot let any claim proceed predicated upon that conduct.

Accordingly, the Motion is granted as to Defendant Butricks.

**b. *Objective/Subjective Elements***

Defendants next assert that Plaintiff's allegations fail to allege facts sufficient to support either the objective or the subjective element. With respect to the objective element, Defendants argue it is undisputed that Plaintiff never was housed with his assailant after the assault, and there was a separation profile in place, such that his only harms are (1) an unrealized risk thereof, and (2) his own fear. Defendants contend these are not sufficiently serious injuries to support an Eighth Amendment claim because a

deliberate indifference claim requires an actual injury. As to the subjective element, they argue that because Plaintiff never returned to the same housing unit as his assailant, none of the defendants could have been aware of any risk to Plaintiff's safety. Plaintiff disagrees that a deliberate indifference claim requires an actual injury, but moreover asserts that he has alleged facts sufficient to show both elements.

To the extent Plaintiff predicates his deliberate indifference claim upon the risk that he would be assaulted by the same assailant, the court agrees with Defendants that he has failed to satisfy the objective prong of his claim. Plaintiff cannot recover for a risk that did not actually exist. The court also finds the risk of assault by others within the prison to be too unsupported by the current record to permit such a claim to go forward. The court grants that the serious assault occurred in the PC Unit, where Plaintiff had been placed for his own protection, which is some indication of a broader threat to Plaintiff's safety than Defendants appreciated. But absent some specific allegations about who or how many associates might have posed further threat to Plaintiff, the court cannot permit a claim to proceed based upon a mere conclusory assertion.

However, the court finds the harm to Plaintiff's psyche, believing that he was soon to be thrown back into the lion's den, is sufficiently serious to satisfy the objective prong of a deliberate indifference claim. It requires no great inference to believe that such a severe beating as Plaintiff received would affect him mentally as much as physically. Indeed, it is undisputed that Plaintiff suffers from PTSD. His fear of being similarly abused (or worse) certainly could cause objectively serious harm to his mental health. The Second Circuit has held the objective element of a deliberate indifference can be

shown through "the risk of serious damage to 'physical and mental soundness.'" *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). And to the extent Defendants assert he must show a physical injury, he clearly has done so in the extensive injuries he sustained in the attack upon him.

The court turns then to the subjective element. Plaintiff contends that the same questions of fact regarding what he was told and when precludes summary judgment. Specifically, he alleges facts sufficient to show, even before his formal diagnosis with PTSD, that the disturbance he felt at the prospect of being returned to where he had just been seriously hurt was evident and severe. The court agrees that these allegations are enough to show the requisite awareness of the risk to Plaintiff's mental health posed by his forced return to the PC Unit. And the court already has found that there is a genuine issue of fact both as to what Defendants Owen and Faraci told (or did not tell) Plaintiff when discussing his housing. This, according to Plaintiff, is sufficient to show the requisite disregard.

The court agrees with Plaintiff only as to Defendants Owen and Faraci. Though the warden might have been able to transfer Plaintiff sooner than he did, it is undisputed that there was a separation profile in place between Plaintiff and his attacker, which a warden reasonably would deem adequate protection against further assault. It does not appear he knew Plaintiff was unaware of the separation profile. Accordingly, the court finds that Plaintiff has failed to show any triable issue as to his recognition of, and disregard for, Plaintiff's fragile mental state. As to Defendants Owen and Faraci, though, the court agrees that if a factfinder concluded they had not informed Plaintiff of the

measure being taken to save him from further harm, thus assuaging his anxiety, that could show their disregard for the clear risk to his mental health posed by his imminent return to the PC Unit.

Accordingly, the court finds that Plaintiff has identified triable issues of fact as to whether Defendants Owen and Faraci were deliberately indifferent to a known risk to his mental health.

### C. <u>Qualified immunity</u>

Finally, Defendants contend that they are entitled to qualified immunity on Plaintiff's claim.

"Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (quoting *McCardle v. Haddad*, 131 F.3d 43, 50 (2d Cir.1997)). Courts employ a two-part inquiry when determining whether a litigant is entitled to qualified immunity: first, the court considers whether the facts alleged, taken in the light most favorable to the injured party, state a violation of a constitutional right; and second, the court considers whether the official's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (internal quotation marks omitted).

The first part of the inquiry has been answered supra: the court already has concluded that the operative facts, as supported by the record, could lead a reasonable

jury to conclude that Plaintiff's constitutional rights were violated. The question, then, is whether Defendants' alleged conduct violated "clearly established" rights.

"For a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Pal v. Canepari*, No. 23-730, 2024 WL 4341360, at *1 (2d Cir. Sept. 30, 2024) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Thus, the inquiry "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Colvin v. Keen*, 900 F.3d 63, 75 (2d Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)) (internal quotation marks omitted). Courts must consider "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 122 (2d Cir. 2024) (quoting *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014)).

The court has not found, and Plaintiff has not provided, any precedential case law that would put Defendants on notice that their conduct may violate the Constitution. Of course, as Plaintiff points out, deliberate indifference claims are not uncommon and the Second Circuit regularly has occasion to reiterate that they violate the Eighth Amendment. But that describes the issue too broadly. Accepting this as proof that the right in question was clearly established would subsume the second step of the qualified immunity analysis into the first.

The second step is distinct from the first, and requires authority showing that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The closest the court found to relevant authority is a single case in which the Second Circuit found a corrections officer's actions towards an inmate with a known mental disturbance (filing a false disciplinary report that caused the inmate to be put on a restrictive diet), such that the inmate suffered a breakdown, could be the basis for a deliberate indifference claim. *Guilbert v. Sennet*, 235 F. App'x 823, 827 (2d Cir. 2007). But *Guilbert* dealt with pleading requirements, which is an analysis distinct from that applied to qualified immunity, and moreover, it is unpublished, and therefore has no precedential value, and has never been cited as sufficient indicia of a clearly established right in similar cases in the almost-twenty years since its issuance. The court cannot rely upon this single case. *See Tellier v. Fields*, 280 F.3d 69, 87 (2d Cir. 2000) ("We hold that a three-judge panel's unpublished opinion that was later disapproved simply does not establish reasonableness as a matter of law."); *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001) ("A district court opinion affirmed by an unpublished table decision does not determine whether a right was clearly established.").

Accordingly, the court finds that Defendants Faraci and Owen are entitled to qualified immunity on Plaintiff's federal claims, and thus to summary judgment on them.

**D. <u>Intentional Infliction of Emotional Distress</u>**

A claim for intentional infliction of emotional distress requires a plaintiff to show "(1) that the actor intended to inflict emotional distress or that he knew or should have known

that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Barry v. Posi-Seal Int'l, Inc.*, 36 Conn. App. 1, 19 (1994), certification granted, cause remanded, 235 Conn. 901 (1995). For all the reasons discussed supra regarding Plaintiff's deliberate indifference claim, the court finds Plaintiff has shown triable issues of fact as to the elements of his state claim. A reasonable jury which accepts Plaintiff's facts could find in Plaintiff's favor on this claim insofar as Defendants Owen and Faraci allegedly failed to inform Plaintiff, who was suffering severe mental and emotional distress at the prospect of being vulnerable to attack so soon after suffering such severe injuries, of the protections that were in place already.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, ECF No. 84, is **GRANTED in part and is DENIED in part.**
    a. Summary judgment is granted in Defendants' favor as to all federal claims.
    b. Summary judgment also is granted to Defendant Butricks on the claim for Intentional Infliction of Emotional Distress.
    c. Summary judgment is denied as to Defendants Faraci and Owen on the claim for Intentional Infliction of Emotional Distress.

2. The parties are instructed to confer and discuss whether they may be able to resolve the remaining claims short of trial. If so, they shall reach out to United States Magistrate Judge Richardson to engage in such discussions on or before <b>**October 30, 2025.**</b> If not, then by the same date the parties shall submit a proposed schedule to govern the remainder of this action.

**IT IS SO ORDERED** at Hartford, Connecticut this 27th day of September, 2026.

/s/
Omar A. Williams
United States District Judge